*Ellen M. Elbert, et al. v. Charles County Planning Commission*, Nos. 1753 & 1754, September Term 2022. Opinion by Storm, J.

**ADMINISTRATIVE LAW AND PROCEDURE – NATURE, REQUISITES, AND FINDINGS IN GENERAL**

Administrative agency's decisions must be accompanied by well-reasoned and articulated administrative findings so that the parties and any reviewing court may determine the reasons for the agency's action.

**ZONING AND PLANNING – FINDINGS REQUIRED**

Meaningful articulation of findings of fact and conclusions are necessary to allow a reviewing court to determine the basis of the agency's action; otherwise, the agency's decision may be deemed arbitrary.

Circuit Court for Charles County
Case Nos.:    C-08-CV-20-000505
                 C-08-CV-20-000507

<u>REPORTED</u>

<u>IN THE APPELLATE COURT</u>

<u>OF MARYLAND</u>

Nos. 1753 & 1754

September Term, 2022

_____

ELLEN M. ELBERT, ET AL.

v.

CHARLES COUNTY
PLANNING COMMISSION

_____

Wells, C.J.,
Nazarian,
Storm, Harry C.
   (Specially Assigned),

JJ.

_____

Opinion by Storm, J.

_____

Filed: November 29, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

Introduction

In 1974, this Court commented that "[t]he [Supreme Court of Maryland][1] in recent years has shown increasing impatience with the failure of administrative boards, whether or not required by statute, to accompany their decisions by specific findings of fact." *Gough v. Board of Zoning Appeals for Calvert County, Maryland,* 21 Md. App. 697, 702 (1974).[2] In the case before us, the Charles County Planning Commission ("Planning Commission") approved two related site development plans (each referenced by the prefix "SDP") to develop a distribution center and associated parking. The primary question for our determination is whether adequate factual findings accompanied these dual SDP approvals. In other words, were the bases for the approvals sufficiently articulated?

Background

The site development plans at issue were filed by Kaz Development, LLC ("Applicant").[3] SDP 20-0008 related to 65 Industrial Park Drive, Waldorf, Maryland[4] and

---

[1]    At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022. *See also* Md. R. 1-101.1(a).

[2]    See also *Turner v. Hammond,* 270 Md. 41 (1973); *Valenzia v. Zoning Board of Howard County*, 270 Md. 478 (1973); *Hooper v. Mayor and City Council of Gaithersburg*, 270 Md. 628 (1974); *Baker v. Board of Trustees*, 269 Md. 740, 747 (1973); *Adams v. Board of Trustees*, 215 Md. 188, 195 (1957).

[3]    The Applicant was operating on behalf of Amazon, LLC.

[4]    This application involves a 9.0-acre site on which there is an existing office building. The application sought approval to reconfigure the property to become a vehicle storage lot for a distribution warehouse.

SDP 20-0033 related to the adjacent property at 9 Jay Gould Court.[5] Both properties are located in the Planned Unit Development ("PUD") zone for Smallwood Village in Charles County. As such, development is governed by both the Charles County Code of Ordinances and Resolutions ("County Code") and the Revised and Restated Docket 90 Order (the "Docket 90 Order") adopted by the Charles County Commissioners.

To develop property within the Smallwood Village PUD, as provided in the Docket 90 Order, a site development plan must comport with the Smallwood Village Master Plan. Accordingly, site development plans within the Smallwood Village PUD are reviewed by the Smallwood Village Planning & Design Review Board (the "PDRB"). In this case, by letter dated January 14, 2020, the Smallwood Village PDRB granted its approval of the proposed uses. As relevant here, the PDRB approval letter simply stated:

> Kaz Development LLC is approved to operate a 24-hour distribution center and offsite employee parking/vehicle storage lot for the distribution operations at these three locations – 65 Industrial Park Drive, 9 Jay Gould Court and 1 Carnegie Court, Waldorf, MD in the St. Charles Business Park. The uses are consistent with 7.01.120, 7.01.210 and 7.02.100 of the Use Table for St. Charles. 65 Industrial Park Drive shall be posted as "Private Property Parking for Authorized Vehicles Only" or ingress/egress controlled.

As part of the overall development approval process in Charles County, site development plans are also reviewed by the Charles County Department of Planning and Growth Management ("DPGM"). Here, DPMG issued staff reports for both SDP 20-0008

---

[5] This application relates to a 10.4-acre parcel on which there is an existing industrial building. The application sought approval to renovate the existing building into a distribution warehouse.

and 20-0033 ("Staff Reports"). The Staff Reports recommended approval of both applications. Those approval recommendations were then forwarded to the Planning Commission, which held separate hearings on the applications.

At a public meeting held on June 22, 2020, the Planning Commission considered SDP 20-0008. The Planning Commission heard from DPMG staff member Kirby Blass, and from Ken Crouse, an engineer for the Applicant.[6] Mr. Blass described the project related to this site as the "proposed Waldorf Distribution Center parking lot, which is located at 65 Industrial Drive, [to be used] for the construction of a vehicle storage lot, which will contain 551 parking spaces." In response to questions raised at the hearing by Planning Commission members about storm water management and how the parking on the site was to "operate in tandem with the other properties," Mr. Crouse provided an explanation that was apparently satisfactory. After hearing that "staff recommend[ed] approval of the SDP as presented, with the three proposed conditions that are specified on page seven of the Staff Report," the Planning Commission Chairman asked, "what's now, the pleasure of the Board, then?" The response was a motion to "approve the [SDP] with the three conditions contained in the staff report to us." The motion was seconded, and without further discussion was approved on a voice vote.

The Planning Commission did not issue a written decision with regard to SDP 20-0008; rather, its decision was memorialized in Minutes of the meeting as follows:

> Staff presented an overview of the Site Development Plan. After the staff presentation, the Planning Commission asked several questions. Next the Applicant and its representatives answered

---

[6]     No one from the public appeared at this meeting.

3

additional questions. A MOTION was made by Mr. Viohl to approve the Site Development Plan with the findings and recommendations included in the Staff Report, which was SECONDED by Mr. Barnes. The vote was unanimous, and the MOTION passed.

(Emphasis in original.)

The Minutes from the June 22, 2020 meeting were approved at the Planning Commission's next monthly meeting on July 20, 2020. At the same July meeting, which was attended by citizens owning property nearby, the Planning Commission also considered SDP 20-0033, related to the 9 Jay Gould Court property. With regard to SDP 20-0033, testimony was offered by several witnesses, including DPMG staff members Blass and Ben Yeckley. Lawrence Green (a traffic expert retained by the citizens) and Craig Casangent (a representative of the Applicant) also provided testimony.[7] Mr. Green spoke about the differences he perceived between the proposed use and the use category under which the project was to be approved. He also addressed the traffic impact of the project. Mr. Casangent disagreed with Mr. Green's characterization of the proposed use and explained how, in his view, the proposed use was in fact the same as that formerly in existence at the site.[8]

---

[7]    The Planning Commission also heard from G. Macy Nelson, Esq., counsel for the citizens, who described what he viewed as shortcomings in the review process and how the proposed use was inconsistent with the use described in the Zoning Ordinance.

[8]    Mr. Casangent also addressed concerns that had been expressed in written comments to the Planning Commission from the Humane Society, an adjoining property owner.

Following the testimony, members of the Planning Commission engaged in a discussion about the nature of the proposed project and its impact on the area. One Commission member, Ms. Sherard, commented:

> But this is a busy business, and I think we just don't have enough information to say that we can make an informed decision saying that what we're presented with tonight is not going to be an adverse impact on APF [adequate public facilities]. So I think that earlier in this conversation there was some discussion or requests maybe by Mr. Yeckley [staff member] to talk with his colleagues, and I agree that maybe we need to have a little bit more information so that this can be the best vote that we can provide for this project tonight and welcome them into the community as they should be welcomed.

Planning Commission Chairperson Magoon replied: "Ms. Sherrard, I would agree with you."

Further discussion transpired, with Vice-Chairperson Murray stating, among other things:

> So, I can't see under Docket 90 where we could require a road study or traffic study. I believe the Staff Report was correct by not doing it according to Docket 90. I don't see where it would have been required. I don't see where we can hold this up over traffic because it's not required.

To that, Chairperson Magoon replied, in part:

> Well, frankly, I was also impressed with the fact that they do the staggered delivery and schedules. You know, I think they addressed traffic pretty well. … I was impressed with the fact that they were addressing traffic that way and the sound wall being a 20-foot barrier. I think they're trying to be a good neighbor right off the bat and agreeing to help with the Humane Society. So those are just my thoughts on it. I think I let everybody else go first. I hope I did.

5

Ms. Sherard responded:

> You did. I don't think we're talking about good neighbor/bad neighbor. I'm just talking about information that we did not have. We learned a lot tonight in this meeting that was left out of the Staff report. Had we known what we know now, maybe there would be a different attitude toward how we go forward in addressing the traffic. Yes, we did learn about staggered times that the employees will be coming and going from work. But we didn't know that before. We didn't have that information.

Further discussion ensued regarding the questions that had been raised at the hearing and Chairperson Magoon recognized that "we have more information than we started with." Another speaker, unidentified in the transcript but apparently a Planning Commission member, asked the question "[t]o what degree is it appropriate to reflect this – the results of this conversation in motions or other approvals that might come out of this permit process?" Planning Commission member Mr. Barnes then stated:

> Well, I was going to say that I do agree that more information has come out than we had coming into this, but I think we have gotten information that was appropriate to answering the questions of Staff -- of, you know, the Board and in our quest to try and protect the people here as well as, hopefully, you know, put planning into place that allows for economic engines to come into the county. So I think that – at least I am satisfied that I've gotten enough information in this to put a motion on the floor. So I would like to make a motion that the Planning Commission approve the site development plan entitled St. Charles Industrial Park Waldorf Distribution Center SDP 200033. This motion shall include the findings that the site development plan will not adversely affect the adequacy of public facilities served in the area, the project or other development, and that the Planning Commission adopt the findings and the recommendation within the Staff Report presented today, 7/20/2020.

6

The motion was seconded, whereupon further discussion ensued, including about the legality of proceeding. Ultimately, a vote was taken and the motion passed unanimously. No written decision was issued regarding SDP 20-0033. Rather, the Planning Commission's action was again simply memorialized in Minutes that were approved at the Planning Commission's meeting on August 31, 2020. Those Minutes state in relevant part:

> Staff presented an overview of the Site Development Plan. After the staff presentation…[n]ext, the Planning Commission asked and staff addressed several questions. A MOTION was made by Mr. Barnes to approve the Site Development Plan with the findings and recommendations included in the Staff Report, which was SECONDED by Mr. Wedding. After further discussion, a vote was taken. The vote was unanimous, and the MOTION passed.

(Emphasis in original.)

Appellants,[9] citizens who claim to be aggrieved by the Planning Commission's decisions, sought judicial review in the Circuit Court for Charles County. The circuit court affirmed the Planning Commission's decisions, after which Appellants noted timely appeals to this court.[10] In these consolidated appeals, Appellants present two issues for our review, which we rephrase as follows:

1. Did the Planning Commission sufficiently articulate the bases for its decisions?

---

[9]    Appellants include Ellen M. Elbert, Paul J. Elbert, II, Ellen M. Elbert Trustee for the Ellen M. Elbert Revocable Trust, Paul J. Elbert, II, Trustee for the Paul J. Elbert, II, Revocable Trust, Elbert's Enterprises, LLC, Lawrence S. Lathrop, Jr., Christi K. Lathrop, and Tybee Properties, LLC (collectively, "Citizen-Petitioners").

[10]    The appeals in the Circuit Court (C-08-CV-20-000505 and C-08-CV-20-000507) have been consolidated into a single appeal before this Court.

2. Are the proposed uses permitted under the Charles County Code of Ordinances and Resolutions?

Because we answer "no" to the first question, we need not, and do not, address the second question.

<u>Standard of Review</u>

"When reviewing a decision of an administrative agency, [this court] will 'look through' the circuit court's decision and 'evaluate the decision of the agency.'" *Hayden v. Maryland Dep't of Nat. Res.*, 242 Md. App. 505, 520 (2019) (citing *Kor-Ko, Ltd. v. Maryland Dep't of the Env't*, 451 Md. 401, 409 (2017)). The agency's decision is reviewed in the light most favorable to it, and the agency's decision is deemed prima facie correct and presumed valid. *Critical Area Comm'n for Chesapeake and Atlantic Coastal Bays v. Moreland, LLC,* 418 Md. 111, 123 (2011). "In general, '[a] court's role is limited to determining if there is substantial evidence in the record as a whole to support the *agency's findings and conclusions*, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'" *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 568 (1998) (emphasis supplied) (citing *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577 (1994)).

Administrative decisions, however, must not be "arbitrary, capricious, or unreasonable" – there must be "substantial evidence from which the board could have reasonably found as it did." *Baker v. Bd. of Trs. of Emps. Ret. Sys. of City of Balt.*, 269 Md. 740, 744 (1973). In that regard, "[a] reviewing court 'may not uphold the agency order *unless it is sustainable on the agency's findings and for the reasons stated by the agency*.'"

8

*McDonell v. Harford Cnty. Housing Agency*, 462 Md. 586, 620 (2019) (emphasis supplied) (citing *United Parcel Svc.*, 336 Md. at 577 (1994)). "Where the agency's factual findings are inadequate, the necessary facts may not be supplied by the parties, and neither we nor the circuit court will scour the record in search of evidence to support the agency's conclusions." *Relay Improvement Assoc. v. Sycamore Realty Co., Inc.*, 105 Md. App. 701,714 (1995). As described in *Mortimer v. Howard Research and Development Corp.*, 83 Md. App. 432, 442 (1990):

> A reviewing court may not, however, uphold an agency's decision if a record of the facts on which the agency acted or a statement of reasons for its action is lacking. Without this reasoned analysis, a reviewing court cannot determine the basis of the agency's action. If the agency fails to meet this requirement, the agency's decision may be deemed arbitrary. In such an instance, the case should be remanded for the purpose of having the deficiency supplied.

(Citations omitted.)

Discussion

As described above, the Planning Commission did not issue a written decision with a "reasoned analysis" with regard to either site development plan. Rather, it memorialized its action approving the SDP in each instance through Meeting Minutes. Those Minutes, however, simply confirm that "a MOTION was made … to approve the Site Development Plan with the findings and recommendations included in the Staff Report…" There was no recitation of the findings made by Staff or quotations from the Staff Report. Instead, there was simply the blithe reference to the Staff Report's "findings and recommendations."

9

There was no separate finding, analysis or conclusion articulated by the Planning Commission.

This case is unlike *Maryland-National Capital Park and Planning Commission v. Greater Baden-Aquasco Citizens Assoc.*, 412 Md. 73 (2009). In *Greater Baden*, the Supreme Court of Maryland affirmed the decision of this Court but commented that its decision was

> more narrow than that expressed in the opinion of our brethren on the intermediate appellate court. We do not subscribe to the view that the Planning Board did not engage otherwise in meaningful fact-finding because its Resolution approving the Preliminary Plan was a 'rote repetition' of the Technical Staff Report. It is not unreasonable for the Planning Board to rely on a Staff Report as the Planning Board did in this case if the Staff Report is thorough, well-conceived, and contains adequate findings of fact.

*Id.* at 110.

Earlier in its *Greater Baden* opinion, the Supreme Court noted that

> the Planning Board did not simply incorporate by reference the Technical Staff Report. It included large portions of the report in the Resolution and added additional findings of fact and conclusions. The Board's adoption of a substantial portion of a Staff Report does not give rise, in and of its mere adoption, to an adverse inference that the Board abdicated its task to exercise independent judgment. The omission in the findings of a required consideration is the focus of our analysis here.

*Id.* at 82 n.9.[11]

---

[11]    In *Greater Baden*, the referenced omission related to a failure to consider the "General Plan's numeric residential growth objective in the Rural Tier in determining whether the Preliminary Plan conformed to the Master Plan." *Id.* at 110.

In contrast, the Planning Commission in this case <u>did</u> simply incorporate by reference the Staff Report. Significantly, it made no "additional findings of fact and conclusions" separate from that report, notwithstanding that in the case of SDP 20-0033 additional information and evidence was presented at the July 20, 2020 Planning Commission hearing and indeed one member commented about how "[w]e learned a lot tonight in this meeting that was left out of the Staff report."[12]

Moreover, as related to the significant issue of compliance with the Docket 90 requirements, the Staff Reports upon which the Planning Commission relied (some of which differed from testimony at the hearing on SDP 20-0033), simply incorporate the findings of the Smallwood Village PDRB, as contained in the one-page approval letter. That letter concludes, without analysis or explanation, that the proposed use is "consistent with" the County Use Table. The Staff Report references the PDRB letter and states that the site plans "received final approval from the PDRB."[13] Here again, there is no analysis, explanation or basis given for the conclusion reached. The Planning Commission could not satisfy its articulation obligations by the simple expedient of referencing a Staff Report that was itself inadequate given its incorporation of a PDRB letter that was devoid of analysis. *See Colao v. County Council of Prince George's County*, 109 Md. App. 431, 458-62 (1986).

---

[12]    Another member commented about what Docket 90 did or did not require, and yet another member commented that "[h]ad we known what we know now, maybe there would be a different attitude toward….addressing traffic."

[13]    All PUD zones require compliance with Docket 90. *See* Code of Charles County, Maryland § 297-93.

11

In *Bucktail v. County Council of Talbot County*, 352 Md. 530, 552 (1999), a case involving the review of an agency decision, the Supreme Court stated that "[l]ogically, the next step in our analysis [after determining the standard of review] would be to determine if the facts found by the Council are supported by substantial evidence. The difficulty here, however, is that the Council's 'findings' are insufficient to permit judicial review."[14] The same is true here. "Courts require specific findings and well-articulated conclusions because citizens are entitled to something more than [a] boilerplate resolution." *Colao*, 109 Md. App. at 453. The Meeting Minutes here fall woefully short of that directive.

Conclusion

Because the Planning Commission failed to articulate adequately the basis for its decisions, the judgments of the circuit court will be reversed. The cases will be remanded to that court with directions to vacate the decisions of the Planning Commission and to

---

[14]     Later in its the *Bucktail* decision, the Court quoted R.M. Anderson, *American Law of Zoning*, §16.41 at 242 (1968) as follows:

> Given express findings, the court can determine whether the findings are supported by substantial evidence, and whether the findings warrant the decision of the board. If no findings are made, and if the court elects not to remand, its clumsy alternative is to *read* the record, *speculate* upon the portions which probably were believed by the board, *guess* at the conclusions drawn from credited portions, *construct a basis* for a decision, and *try to determine* whether a decision thus arrived at should be sustained. In the process, the court is required to do much that is assigned to the board, and the latter becomes a relatively inefficient instrument for the construction of a record.

(Emphasis in original.)

remand these cases to the Planning Commission for further proceedings consistent with

this Opinion.

**THE JUDGMENTS OF THE CIRCUIT COURT FOR CHARLES COUNTY ARE REVERSED AND THE CASES ARE REMANDED TO THAT COURT WITH DIRECTION TO VACATE THE DECISIONS OF THE CHARLES COUNTY PLANNING COMMISSION AND REMAND THE CASES TO THE CHARLES COUNTY PLANNING COMMISSION FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**